Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
Steven J. McCardell (smccardell@djplaw.com)(2144)
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
Salt Lake City, UT 84111
Telephone:  (801) 415-3000/Fax:  (801) 415-3500

Michael V. Blumenthal (mblumenthal@crowell.com)
Bruce J. Zabarauskas (bzabarauskas@crowell.com)
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY  10022
Telephone:  (212) 223-4000/Fax:  (212) 223-4134
Counsel for Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EASY STREET HOLDING, LLC, *et al.* | ) | Bankruptcy Case No. 09-29905 |
| | ) | Jointly Administered with Cases |
| Debtors. | ) | 09-29907 and 09-29908 |
| | ) | |
| Address:  201 Heber Avenue | ) | Chapter 11 |
| Park City, UT 84060 | ) | |
| | ) | Honorable R. Kimball Mosier |
| Tax ID Numbers: | ) | |
| 35-2183713 (Easy Street Holding, LLC), | ) | |
| 20-4502979 (Easy Street Partners, LLC), and | ) | |
| 84-1685764 (Easy Street Mezzanine, LLC) | ) | |
| | ) | |
| Easy Street Partners, LLC, Easy Street | ) | Adv. No. _____ |
| Mezzanine, LLC, and Easy Street Holding, LLC, | ) | |
| | ) | **[REDACTED WITH RESPECT** |
| Plaintiffs, | ) | **TO INFORMATION AND** |
| | ) | **DOCUMENTS DESIGNATED** |
| - against - | ) | **CONFIDENTIAL, MOTION FILED** |
| | ) | **UNDER SEAL REQUESTING** |
| David Wickline, Alchemy Ventures Group, LLC, | ) | **USE OF THESE DOCUMENTS]** |
| Alchemy Ventures Trust, LLC, Charles Flint, | ) | |
| BayNorth Capital, LLC, and BayNorth Realty Fund | ) | **[FILED ELECTRONICALLY]** |
| VI, Limited Partnership, | ) | |
| Defendants. | ) | |

## COMPLAINT

Easy Street Partners, LLC ("Partners"), Easy Street Mezzanine, LLC ("Mezzanine"), and Easy Street Holding, LLC ("Holding"), debtors and debtors in possession (collectively, the "Debtors" or "Plaintiffs"), as and for their complaint in the above-captioned adversary proceeding, respectfully allege as follows:

<u>**OVERVIEW OF ADVERSARY PROCEEDING**</u>

1.      This is an adversary proceeding commenced by the Debtors seeking, <u>inter</u> <u>alia</u>, compensatory and punitive damages against each of the defendants.  The complaint also seeks a judgment: (i) requiring defendant David Wickline ("Wickline") and the entities owned or controlled by him - Alchemy Ventures Group, LLC ("AVG") and Alchemy Ventures Trust, LLC ("AVT") to disgorge any management or development fees that would ultimately be payable to them pursuant to the proofs of claim filed against Partners by Cloudnine Resorts SkyLodge Management LLC ("CRSLM") and Cloudnine Resorts Sky Lodge Development LLC ("CRSLD") in these Chapter 11 proceedings; and (ii) equitably subordinating the claim of defendant BayNorth Realty Fund VI Limited Partnership ("BayNorth") against Mezzanine and Holding in these Chapter 11 proceedings.

2.      As set forth in more detail below, on or about March 30, 2006, plaintiff Mezzanine entered into a mezzanine loan agreement with defendant BayNorth Realty Fund VI Limited Partnership ("BayNorth" or "BN") pursuant to which BayNorth loaned $11,250,000 to Mezzanine (the "BayNorth Loan") in connection with Mezzanine's ownership interest in plaintiff Partners' development and construction of The Sky Lodge (the "Project").

3.      Commencing in or about November 2007, various disputes arose between the Debtors and BayNorth concerning the construction of the Project and operation of

The Sky Lodge.  From the inception of these problems, it has been the Debtors' desire to try to consensually resolve these problems and/or restructure the BayNorth Loan.

    4.     At all relevant times prior to August 26, 2009, David Wickline ("Wickline"), through various entities, was a co-manager of each of the Debtors.

    5.     At all relevant times, defendant Charles Flint ("Flint") was an officer and/or manager of defendant BayNorth, and upon information was also an officer, manager and/or employee of defendant BayNorth Capital LLC ("BayNorth Capital").

    6.     Unbeknownst at the time to the Debtors, their members and their principals, while the Debtors were attempting in good faith to negotiate with BayNorth to resolve their pending disputes, Wickline, in clear breach of his fiduciary duties to the Debtors, began a series of improper communications with Flint in which Wickline clandestinely: (i) provided to BayNorth copies of internal memorandum between and among the principals of the Debtors' equity holders and Debtors' counsel concerning the Debtors' disputes with BayNorth; (ii) wrote or discussed with BayNorth matters related to the Project and BayNorth, which were subject to the attorney-client privilege between the Debtors and their counsel; (iii) provided to BayNorth in telephone conversations, meetings and voicemails, information relating to the Debtors' partners' strategies in negotiating with BayNorth and addressing problems they were having with BayNorth; and (iv) provided advice to BayNorth concerning proposals that the Debtors would be discussing in the future with it.

    7.     Wickline's actions were a clear breach of his fiduciary duties to the Debtors, as well as the fiduciary duties owed to the Debtors by defendants AVG and AVT which are entities which Wickline owned, managed and/or controlled.

3

8.      Indeed, in his improper communications with BayNorth, Wickline would often go so far as to write or state to BayNorth that "this is an offline conversation," or that he was "breaking ranks" with the principals of the Debtors' equity holders, or that he could be a "blocking vote" on partnership matters concerning the Debtors.

9.      Instead of either informing the Debtors that it had received confidential internal partnership or attorney-client privileged information which had been improperly divulged by Wickline, or informing Wickline that it was improper for BayNorth to receive such confidential information and ceasing to accept such information from him, BayNorth aided and abetted Wickline's numerous and continuing breaches of his fiduciary duties by encouraging him to continue his illicit dialogue with BayNorth, through which BayNorth continued to receive "inside information" concerning the Debtors' negotiating strategies with BayNorth, as well as information concerning internal company disputes.

10.     Indeed, according to a sworn statement executed by Wickline, BayNorth went so far as to state or, at least imply, to Wickline that, based upon his "cooperation" with them, BayNorth would not seek to impose personal liability upon Wickline under his guarantee of the BayNorth Loan, or seek to collect on such guarantee against him.

11.     Moreover, as a "reward" for his actions, Flint, BayNorth and BayNorth Capital, LLC made a business introduction for Wickline in connection with an investment made by Wickline which was unrelated to the Debtors' business.

4

12.    The Defendants' actions in breaching and aiding and abetting numerous breaches of fiduciary duties have resulted in substantial damage to the Debtors and their creditors.  Additionally, the Defendants' egregious conduct which transcends all bounds of legitimate, ethical business conduct, should not be countenanced and an award of punitive damages should also be entered against the Defendants.  Wickline should also be required to disgorge any management or development fees that would ultimately be payable to him pursuant to the proofs of claim filed by CRSLM and CRSLD, and the claims filed by Wickline, AVG and AVT in these Chapter 11 cases should be expunged.  Finally, BayNorth's claims against Mezzanine and Holding should be equitably subordinated.

## JURISDICTION AND PARTIES

13.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and venue is proper pursuant to 28 U.S.C. § 1409.

14.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C) and (O).

15.    Plaintiff Partners is a Utah limited liability company, and has a principal place of business at 201 Heber Avenue, Park City, Utah 84068.

16.    Plaintiff Mezzanine is a Delaware limited liability company, and has a principal place of business at 201 Heber Avenue, Park City, Utah 84068.

17.    Plaintiff Holding is a Utah limited liability company, and has a principal place of business at 201 Heber Avenue, Park City, Utah 84068.

18.    Defendant, Wickline is an individual who resides at 17575 Fitzpatrick Lane, Occidental, California 95465.

5

19.     Upon information and belief, defendant AVG is a Utah limited liability company with a principal place of business at 10 Exchange Place, Salt Lake City, Utah 84111.

20.     Upon information and belief, defendant AVT is a limited liability company with a business address at 10 Exchange Place, Salt Lake City, Utah 84111.

21.     Upon information and belief, defendant Flint is an individual who resides in the State of Massachusetts and has a business address c/o BayNorth Capital, LLC, One Financial Center, 23rd Floor, Boston, Massachusetts 02111.  Upon information and belief, Flint is the managing director of defendant BayNorth, and is also an employee, officer and/or equity holder in defendant BayNorth Capital.

22.     Defendant BayNorth is a Delaware limited partnership, with a principal place of business c/o BayNorth Capital, LLC, One Financial Center, 23rd Floor, Boston, Massachusetts 02111.

23.     Upon information and belief, defendant BayNorth Capital, LLC ("Bay North Capital") is a Massachusetts limited liability company with a principal place of business c/o BayNorth Capital, LLC, One Financial Center, 23rd Floor, Boston, Massachusetts 02111. Upon information and belief, defendant BayNorth Capital owns all or substantially all of the equity interests in BayNorth.

## BACKGROUND

24.     On September 14, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  An Official Committee of Unsecured Creditors was appointed on October 6, 2009.  The Debtors continue to operate their business and manage their property as debtors-in-possession.

6

25.     Plaintiff Partners is the owner and operator of The Sky Lodge in Park City, Utah.  The Sky Lodge is a luxury boutique hotel located in the middle of historic Main Street in Old Town Park City.

26.     Plaintiff Mezzanine is the 100% owner and managing member of Partners.

27.     Plaintiff Holding is the 100% owner and managing member of Mezzanine.

28.     The equity holders of Holding, along with their percentage ownership and the identity of the ultimate principal of each equity holder is as follows:  (i) Cloudnine Resorts, LLC – 38.75% - William Shoaf; (ii) AVG – 38.75% - Wickline; (iii) Park City LLC – 12.5% - Michael Feder and Elizabeth Rad; and (iv) Utah Coal and Lumber, Inc. – Philo Smith and Diane Smith – 10%.

29.     Defendants AVG and AVT are owned and/or controlled by defendant Wickline.

30.     On January 5, 2010, BayNorth filed proofs of claim against Holding and Mezzanine in an "amount of no less than $44,022,908.20" (collectively, the "BayNorth Claims").

31.     On January 6, 2010, Wickline filed a proof of claim: (i) against Holding in an "amount of not less than $38,000,000" (the "Holding Claim"); and (ii) against Partners and Mezzanine in the amount of $4,607.90 (collectively, the "Wickline Claims").

32.     On January 6, 2010, AVG filed a proof of claim against Holding and Mezzanine in the amount of $4,607.90 (the "AVG Claim").

7

## THE BAYNORTH LOAN

33.     On or about March 30, 2006, plaintiff Mezzanine entered into the
BayNorth Loan with BayNorth pursuant to which BayNorth loaned $11,250,000 to Mezzanine
in connection with Mezzanine's ownership interest in plaintiff Partners' development and
construction of the Project.

34.     In connection with the BayNorth Loan, Wickline and William Shoaf both
executed limited guarantees (the "Guarantees").

35.     Commencing in or about November 2007, various disputes arose
between the Debtors and BayNorth concerning the construction of the Project and operation of
The Sky Lodge.  From the inception of these problems, it has been the Debtors' desire to try to
consensually resolve these problems and/or restructure the BayNorth Loan.

## THE FIDUCIARY DUTIES OWED TO THE
## DEBTORS BY WICKLINE, AVG AND AVT

36.     At all times prior to August 26, 2009, Holding was co-managed by
Wickline and William Shoaf ("Shoaf") through AVG-SL, LLC which is an entity owned 50%
by AVT and 50% by Cloudnine Resorts LLC ("Cloudnine").  As a result, Wickline and AVT
owe a fiduciary duty to Holding.

37.     At all relevant times, plaintiff Mezzanine has been wholly owned and
controlled by plaintiff Holding.  Wickline, AVG and AVT owe a fiduciary duty to Holding and
Mezzanine as a result of AVT's membership interest in and control of AVG, AVG's
membership interest in Holding and Wickline's ownership and/or control of AVG and AVT.

38.     At all relevant times plaintiff Partners has been controlled by Plaintiffs, Mezzanine and Holding.  As a result, Wickline, AVG and AVT owe a fiduciary duty to Partners.

39.     At all relevant times prior to August 26, 2009, The Sky Lodge was co-managed by Wickline and Shoaf pursuant to a management agreement between CRSLM and Partners, dated March 30, 2006 (the "Management Agreement").  CRSLM is an entity which is owned 50% by AVT and 50% by Cloudnine.  As a result, defendants Wickline and AVT owed a fiduciary duty to Partners.  AVT and /or Wickline would be entitled to 50% of the management fee payable to CRSLM under the Management Agreement.

40.     At all relevant times prior to August 26, 2009, Wickline and Shoaf developed the Project on behalf of Partners pursuant to a development agreement, dated March 30, 2006 between CRSLD and Partners (the "Development Agreement").  CRSLD is an entity which is owned by 50% by AVT and 50% by Cloudnine.  As a result, Wickline and AVT owe a fiduciary duty to Partners.  AVT and/or Wickline would be entitled to 50% of the development fee payable to CRSLD under the Development Agreement.

41.     A copy of the organizational chart showing the relationships between the Debtors, AVG and AVT is annexed hereto as Exhibit A.

### WICKLINE, AVG and AVT'S BREACHES
### OF THEIR FIDUCIARY DUTIES TO THE DEBTORS

42.     Commencing no later than February 2008, defendant Wickline began a series of improper communications with BayNorth pursuant to which Wickline: (i) divulged confidential internal communications among the principals of the Debtors' equity holders; (ii) shared attorney-client privileged communications between the Debtors and their counsel;

and (iii) provided information and advice to BayNorth in connection with the Debtors' ongoing discussions and negotiations with BayNorth.

43.     On March 18, 2008, Flint sent an email (the "March 18 Flint Email") to certain of the Debtor's partners registering complaints about alleged cost overruns at the Project.  The March 18 Flint Email stated, <u>inter alia</u>: "These overruns obviously cut into BayNorth's equity participation and we expected that you would submit a proposal to compensate BayNorth for these unapproved expenditures."  (A copy of the March 18 Flint Email is annexed hereto as <u>Exhibit B</u>.)

44.     **PARAGRAPH 44 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

45.     **PARAGRAPH 45 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

46.     **PARAGRAPH 46 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

47.     **PARAGRAPH 47 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

48.     On June 10, 2008, Wickline breached his fiduciary duties to the Debtors by forwarding the May 8 Shoaf Email to Flint (the "June 10 Wickline Email"). The June 10 Wickline Email is included in Exhibit D.

49.     By email dated April 28, 2008, Partners informed BayNorth that they had appointed Michael Feder ("Feder") as the equity holders' "point person in communication and

discussions with BayNorth as it pertains to the SkyLodge project." (A copy of such email is annexed hereto as Exhibit E).

   50. **PARAGRAPH 50 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

   51. On May 9, 2008, Elizabeth Rad, a principal of one of the Debtors' equity holders, sent an email (the "May 9 Rad Email") to Wickline, which was copied to the principals of the Debtors' equity holders and the Debtors' counsel, which stated: "Your emails show that the only role you played from the moment we closed thru December of last year was to deride and question Bill Shoaf and to support Baynorths efforts to deride and jeopardize the project for their own financial gain." Rad's email to Wickline continued: "I would suggest that from this point on you be very careful of which side of the table you are on." (A copy of the May 9 Rad Email is annexed hereto as Exhibit F.)

   52. **PARAGRAPH 52 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

53.     On June 4, 2008, Feder sent an email marked "confidential" to Wickline concerning a dispute between the Debtors and BayNorth about a brokerage agreement relating to the sale of fractional units at The Sky Lodge (the "June 4 Feder Email"). In the June 4 Feder Email, Feder told Wickline that he had sufficient votes for the Debtors to approve a resolution of such issue and that the only remaining approval needed was Flint's "which I expect to get by the end of the day."

54.     On June 5, 2008, Wickline breached his fiduciary duties to the Debtors by forwarding the June 4 Feder Email to Flint in an email in which Wickline stated:

> Charlie:
>
> The tame part of my exchanges with our friend Feder. He indicated below he could have your approvals of his demand ... perhaps he will find disappointment.

(the "June 5 Wickline Email"). Copies of the June 4 Feder Email and June 5 Wickline Email are annexed hereto as Exhibit G.

55.     On June 9, 2008, Flint forwarded to Wickline various emails from Feder and Debtors' counsel concerning the brokerage issue. On the same day, Wickline breached his fiduciary duties to the Debtors by sending Flint an email concerning Feder and Debtors' counsel's replies to Flint, which email stated: "These replies are so disingenuous." (Copies of these e-mails are annexed hereto as Exhibit H.)

56.     Similarly, on June 10, 2008, Wickline breached his fiduciary duties to the Debtors by sending an email to BayNorth (the "June 10 Wickline Email") attacking Debtors' counsel and Feder by stating "Blake [Debtors' counsel] ignores the most salient issues and MF

13

[Feder] blusters with simpleminded responses that shows he has little grasp of the issues." (A copy of the June 10 Wickline Email is annexed hereto as <u>Exhibit I</u>.)

57.     On June 10, 2010, Wickline sent an email to Feder entitled "Sky Lodge Objectives Memo" which stated: "Michael, Attached are some thoughts on strategies to pursue." On that same day, Wickline breached his fiduciary duties to the Debtors by forwarding this strategic memo to Flint. (Copies of these emails are annexed hereto as <u>Exhibit J</u>.)

58.     On July 31, 2008, Wickline breached his fiduciary duties to the Debtors by sending an email to Flint stating that he (Wickline) had just "hit Blake Parrish [Debtors' counsel] with a letter that should make any lawyer feel the need to call his insurance carrier." (A copy of Wickline's July 31, 2008 email to Flint is annexed hereto as <u>Exhibit K</u>.)

59.     During the spring and summer of 2008, Wickline enlisted Flint and BayNorth in his efforts to have changes made in the Debtors' managerial structure.

60.     On July 31, 2008, Wickline sent an email to Larry Vogler, who was a broker associated with the origination of the BayNorth Loan in 2006. In his email, Wickline wrote: "been working on ways to oust Shoaf and been talking to Charlie [Flint]... Now I think I will intervene with the aid of Charlie." (A copy of this email is annexed hereto as <u>Exhibit L</u>).

61.     As a result of, <u>inter alia</u>, Wickline's urging and with Wickline's help and support, starting in the Spring of 2008, BayNorth sought to take actions to interfere with the Debtors' internal management, and sought to use its position as a lender to assist Wickline in his attempts to make such managerial changes. Indeed, BayNorth sought to make managerial

14

changes for Partners even though there existed no lender-borrower relationship between

BayNorth and Partners.

       62.    By email dated September 3, 2008 (the "September 3 Wickline Email"),

at a time when BayNorth claimed that Mezzanine was in default under the BayNorth Loan,

Wickline, hoping to cash in on his actions as a "mole" for Flint and BayNorth, asked Flint and

BayNorth to provide him with an introduction to a company named Miraval in connection with

an investment which was unrelated to the Debtors.

       63.    On September 5, 2008, Flint sent an email (the "September 5 Flint

Email") to a principal and/or officer of defendant BayNorth Capital requesting its assistance in

trying to assist Wickline by "set[ting] him up with either the people at Miraval or someone who

can make a proper introduction per the attached email." (Copies of the September 3 Wickline

Emails and September 5 Flint Email are annexed hereto as Exhibit M.)

       64.    Upon information belief, in addition to the actions set forth at ¶¶ 1

through 63 of this Complaint, Wickline and BayNorth, through Flint, engaged in numerous

other communications, including telephone conversations, in which Wickline breached his

fiduciary duties to the Debtors by disclosing confidential internal information concerning the

Debtors' strategies in addressing its ongoing disputes with BayNorth, and information which

was protected by the attorney-client privilege between the Debtors and their counsel.

       65.    According to an affidavit executed by Wickline, during one or more of

these conversations, Flint told Wickline that he appreciated Wickline's "cooperation," that he

did not want to do anything to "hurt" Wickline, and either stated or implied that it would not

seek to impose liability upon Wickline under the Guarantees, and that BayNorth, as a private

company, had "flexibility" in determining against whom to proceed and seek recovery.

    66.    **PARAGRAPH 66 IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH.**

    67.    At all relevant times, Allen Taylor was the principal of Taylor Capital

Management, which was retained by BayNorth as a consultant in connection with the BayNorth

Loan and/or the Project.

    68.    Upon information belief, in addition to the actions set forth at ¶¶ 1

through 67 of this Complaint, Wickline and Allen Taylor engaged in numerous

communications in which Wickline breached his fiduciary duties to the Debtors by disclosing

confidential internal information concerning the Debtors' strategies in addressing its ongoing

disputes with BayNorth, and information which was protected by the attorney-client privilege

between the Debtors and their counsel.

    69.    Wickline's aforementioned communications to Flint were conducted

surreptitiously by Wickline, without the knowledge of the Debtors' equity holders and their

principals, and was done for the purpose of impeding the Debtors' relationship with BayNorth.

70.    Wickline's aforementioned conduct also constituted breaches of the

fiduciary duties owed to the Debtors by AVG and AVT.

## AS AND FOR THE FIRST CAUSE OF ACTION
### Breach Of Fiduciary Duty
### (Against Defendants Wickline AVT And AVG)

71.    The Debtors repeat and incorporate ¶¶ 1 through 70 as if fully set forth

herein.

72.    Wickline owed a fiduciary duty to each of the Debtors.

73.    AVG and AVT owed a fiduciary duty to the Debtors.

74.    Wickline's actions as set forth in this Complaint were designed to belittle

the Debtors, their partners and their counsel to BayNorth at a time when the Debtors were

engaged in discussions and negotiations with BayNorth over ongoing disputes between the

Debtors and BayNorth.

75.    Wickline breached his fiduciary duties to each of the Debtors.

76.    Wickline's breaches of his fiduciary duties occurred at a time when he

was requesting to have his membership interests in Holdings purchased by the Debtors' other

principals or third parties.

77.    Wickline's actions constituted a breach by AVG and AVT of their

fiduciary duties to the Debtors.

78.    The Debtors were damaged by the aforementioned breaches of fiduciary

duties of Wickline, AVG and AVT.

79.    Wickline and AVG's aforementioned breaches of their fiduciary duties were willful, wanton, egregious, and exceeded all bounds of legitimate, ethical business conduct.

80.    The Debtors are entitled to a judgment awarding them compensatory and punitive damages against defendants Wickline, AVG and AVT.

## AS AND FOR THE SECOND CAUSE OF ACTION
### Aiding And Abetting Breaches Of Fiduciary Duty
### (Against Defendants Flint And BayNorth)

81.    The Debtors repeat and incorporate ¶¶ 1 through 80 as if fully set forth herein.

82.    At all relevant times, Flint was acting as the managing member, or as an officer of BayNorth, and was acting within his scope of his actual or apparent authority.

83.    At all relevant times, Flint and BayNorth were aware that Wickline owed a fiduciary duty to each of the Debtors.

84.    At all relevant times, Flint and BayNorth were aware that AVG and AVT owed a fiduciary duty to the Debtors.

85.    At all relevant times, Flint and BayNorth were aware that Wickline was providing information to them in breach of his fiduciary duties to the Debtors.

86.    At all relevant times, Flint and BayNorth were aware that Wickline was providing information to them in breach of AVG and AVT's fiduciary duties to the Debtors.

87.    Notwithstanding Flint and BayNorth's knowledge that they were receiving information from Wickline in breach of the aforementioned fiduciary duties, Flint and BayNorth encouraged Wickline to continue breaching such fiduciary duties by encouraging

Wickline to continue to provide them with, inter alia,: (i) confidential internal communications between and among the Debtors, principals of the Debtors' equity holders; and (ii) confidential attorney client communications between the Debtors and their counsel.

88.     Upon information and belief based upon a sworn statement executed by Wickline, as part of its encouragement to Wickline, Flint and BayNorth stated or implied to Wickline that they would not seek to impose liability upon Wickline on the Guarantees or that it would not seek to collect upon such Guarantees from Wickline. Additionally, Flint and BayNorth, as a reward for Wickline's actions, agreed to assist Wickline by making a business introduction for Wickline in connection with an investment which was unrelated to the Debtors.

89.     The actions of Flint and BayNorth aided and abetted Wickline in breaching his fiduciary duties to the Debtors.

90.     The actions of Flint and BayNorth aided and abetted AVG and AVT in breaching its fiduciary duties to the Debtors.

91.     The Debtors were damaged by Flint and BayNorth's actions in aiding and abetting the aforementioned breaches of fiduciary duty.

92.     Flint and BayNorth's aforementioned actions were willful, wanton, egregious, and exceeded all bounds of legitimate, ethical business conduct.

93.     The Debtors are entitled to a judgment awarding them compensatory and punitive damages against Flint and BayNorth.

### AS AND FOR THE THIRD CAUSE OF ACTION
### Respondeat Superior/Liability Based Upon Agency
### (Against Defendant BayNorth Capital)

94.     The Debtors repeat and incorporate ¶¶ 1 through 93 as if fully set forth herein.

95.     Upon information and belief, BayNorth is wholly or substantially owned by BayNorth Capital.

96.     Upon information and belief, at all relevant times, Flint was an officer, member and/or employee of BayNorth Capital.

97.     The actions taken by Flint as set forth in the Complaint were taken as either an employee acting within the scope of his employment, or as an agent of BayNorth Capital acting within the scope of his agency.

98.     BayNorth Capital is vicariously liable for the actions of its employees acting within the scope of their employment, and for the actions taken by their agents acting within the scope of their agency.

99.     BayNorth Capital is vicariously liable for Flint and BayNorth's aiding and abetting Wickline's breaches of fiduciary duty to the Debtors.

100.    BayNorth Capital is vicariously liable for Flint and BayNorth's aiding and abetting AVG and AVT's breaches of fiduciary duties to the Debtors.

101.    The Debtors are entitled to a judgment awarding them compensatory and punitive damages against Flint and BayNorth.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### Expungement Of Claim
### (Against Defendants Wickline and AVG)

102.    The Debtors repeat and incorporate ¶¶ 1 through 101 as if fully set forth herein.

103.    As a result of his numerous breaches of fiduciary duty to Partners, Wickline and AVG were faithless servants and/or disloyal agents to the Debtors.

104.    As a result of Wickline's and AVG's numerous breaches of fiduciary duty, Wickline and AVG have forfeited any right to compensation for services they performed for the Debtors, or the right to be paid with respect to any claim they filed against Debtors.

105.    Accordingly, the Wickline Claim and AVG Claim should be expunged in their entirety.

106.    Wickline's Holding claim is a contingent claim for reimbursement or contribution for which Holding is allegedly co-liable. Accordingly, Wickline's Holding Claim should also be expunged pursuant to § 502(e)(1)(B) of the Bankruptcy Code.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### Disgorgement
### (Against Defendants Wickline and AVT)

107.    The Debtor repeat and incorporate ¶¶ 1 through 106 as is fully set forth herein.

108.    Wickline and/or AVT are entitled to 50% of the management fees collected by CRSLM, and 50% of the development fees collected by CRSLD.

109.    As a result of their numerous breaches of their fiduciary duties to the Debtors, Wickline and AVT should be required to disgorge any claims they have to

21

management fees to be received by CRSLM or development fees to be received by CRSLD in

connection with the Debtors.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### Equitable Subordination
### (Against Defendant BayNorth)

110.    The Debtors repeat and incorporate ¶¶ 1 through 109 as if fully set forth

herein.

111.    BayNorth engaged in inequitable conduct by aiding and abetting

Wickline and AVG's breaches of fiduciary duty to the Debtors.

112.    The Debtors, their creditors and their equity holders have been damaged

by BayNorth's inequitable conduct.

113.    Pursuant to § 510 of the Bankruptcy Code, the BayNorth Claims against

Mezzanine and Holding should be equitably subordinated to a priority below all other creditors

of Mezzanine and Holding.

WHEREFORE, the Debtors seek judgment as follows: (i) on their first cause of

action, the Court should enter a money judgment in an amount of not less than $1,000,000 in

compensatory damages and $1,000,000 in punitive damages against defendants Wickline, AVG

and AVT; (ii) on their second cause of action, the Court should enter a money judgment in an

amount of not less than $1,000,000 in compensatory damages and $1,000,000 in punitive

damages against defendants Flint and BayNorth; (iii) on their third cause of action, the Court

should enter a money judgment in an amount of not less than $1,000,000 in compensatory

damages and $1,000,000 in punitive damages against defendant BayNorth Capital; (iv) on their

fourth cause of action, the Court should enter a judgment expunging the Wickline Claims and

AVG Claim; (v) on their fifth cause of action, the Court should enter a judgment requiring

Wickline and AVT to disgorge any right to any management or development fees he is entitled

to from CRSLM and CRSLD in connection with the Debtors; (vi) on their sixth cause of action,

the Court should enter judgment pursuant to § 510 of the Bankruptcy Code, equitably

subordinating the BayNorth Claims to all other creditors of Mezzanine and Holding; and (vii)

the Court should grant the Debtors such other and further relief as is just and proper.

Dated: May 27, 2010

DURHAM JONES & PINEGAR, P.C.

By:    /s/  Kenneth L. Cannon II
Kenneth L. Cannon II (kcannon@djplaw.com)(3705)
Steven J. McCardell (smccardell@djplaw.com)(2144)
111 East Broadway, Suite 900
P.O. Box 4050
Salt Lake City, UT 84111-4050
Telephone: (801) 415-3000
Facsimile: (801) 415-3500

And

CROWELL & MORING LLP
Michael V. Blumenthal (mblumenthal@crowell.com)
*(admitted pro hac vice)*
Bruce J. Zabarauskas (bzabarauskas@crowell.com)
*(admitted pro hac vice)*
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4134

Counsel for Debtors and Debtors in Possession

# **<u>Exhibit A</u>**

## EASY STREET PARTNERS, LLC OWNERSHIP STRUCTURE



BN-0034807

BN-0034807

# <u>Exhibit B</u>

| From: | Charlie Flint <cflint@baynorthcapital.com> |
|---|---|
| Sent: | Tuesday, March 18, 2008 5:42 PM |
| To: | Michael A. Feder <mfeder@radarlogic.com> |
| Cc: | Wicklinedavid@cs.com; William Shoaf <bshoaf@cloudnineresorts.com>; Allen Taylor <allen.taylor@taycap.net> |
| Subject: | Sky Lodge |
| Attach: | Charles J. Flint (CFlint@baynorthcapital.com) (CFlint@baynorthcapital.com).vcf |

Michael,

We received the revised "Sources and Uses" statement and reconciliations that Bill submitted late last Friday and are reviewing this information. I should stop reviewing the results and asking questions as it appears the costs increase significantly with each revision. In an effort to grasp the total picture of the financial condition of the development and it operations, we had also requested a summary of operating results from the December 26th opening through which ever date Bill can provide, as we have a priority to the equity on cash flow.

It is clear that a significant portion of the development cost overruns were the result of unapproved change orders including the development of the bakery in what was to be the Spa entrance, the construction of a third restaurant in space previously designated as meeting room space, the renovation of the former Easy Street restaurant into Fin and FF & E expenditures that ran out of control. These overruns obviously cut into BayNorth's equity participation and we expected that you would submit a proposal to compensate BayNorth for these unapproved expenditures. We would also like to know if you plan to address any of the overruns with the contractors and/or vendors.

Yesterday we received an updated sales report in the format that was previously used and we appreciate your response to this request. The sales pace is obviously below projections and I would appreciate any thoughts you may collectively have on addressing this issue.

Finally, I believe the venture is sitting on a significant amount of cash that was derived from fractional sales proceeds. We are entitled to receive 20% of these proceeds with the remaining 80% distributed to West LB. Could you please provide an accurate accounting of the proceeds and the ventures plans to distribute these funds?

Thank you for your assistance in sorting out the financial aspects of this development.

Charlie

**BN-0015138**

BN-0015138

# <u>Exhibit C</u>

**EXHIBIT C IS REDACTED PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH**

# **<u>Exhibit D</u>**

**From:** "Charlie Flint" <cflint@baynorthcapital.com>
**Date:** June 10, 2008 11:55:53 AM PDT
**To:** "David Wickline" <wicklinedavid@cs.com>
**Subject: RE: Skylodge - need for open book discussions**

Well written David, Bill is delusional, do you think he has a brain tumor or something that impacts his ability to understand?  "Hostile actions towards him personally"? Hell I have not seen him since January and the only call I have had with him since that I can recollect is with the auditors.  He should have down the deal with someone like Steve Ross of Related and see how his incompetence was rewarded.

**From:** David Wickline [mailto:wicklinedavid@cs.com]
**Sent:** Tuesday, June 10, 2008 10:06 AM
**To:** Charlie Flint
**Subject:** Fwd: Skylodge - need for open book discussions

Begin forwarded message:

**From:** William Shoaf <bshoaf@cloudnineresorts.com>
**Date:** May 8, 2008 3:08:54 PM PDT
**To:** David Wickline <wicklinedavid@cs.com>
**Cc:** Michael Feder <michael@thefedergroup.com>, Elizabeth Rad <erad237@yahoo.com>, Blake Parrish <blake@bparrishlaw.com>
**Subject: Re: Skylodge - need for open book discussions**

David

1

WICK-00025

Thank you for your email and please excuse my delay in responding but I have had pressing matters with regards to buttoning up close out issues with Sky Lodge, compiling final accounting from the subcontractors, and providing Merritt & Harris with requested documentation needed for the processing of the next disbursement request.

From speaking with Michael it appears that you have shared your concerns regarding my non responsiveness to you with him and as such I have included PC1 in this response to ensure we are all in the loop and copied Blake as he was included in the initial email.

For clarity and efficiency I would like to address your points in the order presented below:

*Exclusion of your involvement / Withholding Information*

I have provided numerous reports and worksheets, answered countless emails and had many one on one conversations with all of the partners, bankers and consultants associated with the project. Whenever you have visited the project I have made myself available, rearranged my calendar accordingly and answered all questions asked. This has been true of my actions with all the partners, bankers and consultants over the 2+ years.

I have specifically spoken with Chipper regarding his provision of information to you during the visit you cite, and other occasions, and can assure you that he has never been instructed by me to withhold anything. In fact the meeting you speak of was arranged within 30 minutes of the request that weekend in question and my understanding was that Meredith and yourself spent 5 hours with Chipper on Sunday reviewing whatever documents were requested. My further understanding in speaking with Chipper is that you have contacted him on other occasions for information and he has supplied it to the best of his ability.

As to assembling the "facts" on the project requested by Michael that was eventually delegated to Chipper and Brenda to execute and ended up on my desk to review and ensure timely processing.

*Involvement of Michael Feder & PC1*

First and foremost I make no apologies or explanations for my including Michael's (or any of the other partners) in the issues of the project. I would suggest that your criticism of that is somewhat in conflict with your previous view of being excluded from the information flow of the project.

As to the May 2nd meeting I believe it is best to refresh the memory of the actual chain of events that surrounded this weekend. First and foremost Michael was at the property on a holiday with his family that had been booked for several weeks. His presence was coincidental. However, your visit to the property was planned directly with Steve Koersleman with no notice to me. I became aware of your visit second hand from Steve. This unusual situation was further complicated by your booking a room for Allen Taylor directly with Steve without informing me again. Given the state of the partnerships relations with BayNorth at that time I found (and still find) this set of circumstances to be very curious and disturbing. I shared my concern with Michael and his reaction, as you are aware, was to exercise the rights of PC1 and assume leadership of the partnership.

As to my relationship with the members of PC1 and Smith Trust I have had ongoing interactions with the partners over the two years as they have visited the project and / or called to ask questions or inquire as to the progress of construction or sales.

*Current Status with BayNorth*

2

WICK-00026

I agree wholeheartedly that this situation with BN is undesirable and potentially dangerous. However, I would take issue that this is the result of bad faith actions by myself or lack of response by myself or Michael. Quite simply BN - via Allen Taylor - have not read what was sent or pay attention in meetings conducted over the past two years. I find it completely illogical that Ricardo Flores of Merritt & Harris, all of the Jacobsen crew, Steve Brown, and Chipper Leonard could sit through the same meetings and receive the same documents as Allen Taylor and fully aware of what was going on while BN presents that they were kept in the dark. It simply does not hold water. I also find it disingenuous for Charlie or you to present this as fact when neither of you were present for over 80% of the meetings and have no basis to judge the actions of Taylor Capital as the consultant during those visits.

The fact is - as I presented to you in the early fall as well as Larry Vogler when I asked for assistance - that Charlie is simply looking for a retrade. Just like he did at the closing table. No more no less.  I have held this to be the case from Day 1 and I would suggest that Charlie's actions with the payment requests and brokerage agreement situations confirm my view that documents / requests are met initially with no review or feedback and then - when pressed for an answer - a blanket denial.

*Financial Reporting*

The reporting of the cost status of an ongoing construction project that has over 200 workers on 12 hour a day shifts, 103,000 square feet of new construction, and 8,500 square feet of historic renovation is not a precise exercise. It is assembling the best data at the time and providing a studied estimate. As your experience managing the entitlement cost for Napa showed - what started as an estimated cost of $4 million, when the dust settled, had a cost of $7 million. It is the nature of development.

As to your examples of cost escalations from the progress report put together for January 31st that report was done (as I explained in the email sent with the report) late night during the Sundance Festival period. Not the best time for this type of effort but done nonetheless to appease BN. You are correct that from this report to the February report the number jumped $952K - of which $742K was due to improper period to date numbers that went back to 2006 and had been validated by an external audit. From February to March the number went up $92K (a 0.17% increase) and from March to April by $51k (a 0.097% increase). Expecting to have a final number by end of January that would not be open to changes, late billings, and back charges is simply outside the scope of reality on any construction project of this size and complexity.

*Change Orders*

Change orders were done and they were logged in several places - by Jacobsen, by Chipper, by Merritt & Harris. They were reviewed and signed off in the monthly meetings. This is a trojan horse - just like the Fin issue.

*Brokerage Agreement*

The fact that Carrie is the listing agent for the property is a fact that has been disclosed to all concerned for over three years. There is no duplicity here and your insinuations are out of line. The implications of self dealing are also out of line. The fact is that Carrie - in the hottest real estate market in Park City's history (2005-7) removed herself from the general marketplace and released her project listings which included St Regis ($400 million) and Silver Star ($200 million) to devote herself full time to our $70 million listing. The math speaks for itself. And may I remind you that before you were made a partner in this project Carrie was the listing agent so any concerns on this subject should have been discussed then.

The issue at hand is very simple - on June 11th the listing with Prudential is done. Carrie & her group are moving to Keller Williams. If Sky Lodge would like to continue to have Carrie list the property, use the LRG

3

WICK-00027

sales center, have access to the client data base and keep a continuity in the market place then it can agree to move with Carrie to KW and pay 6% versus 7% commissions. If not then someone other than me needs to come up with Plan B and present to the partners for review and agreement. But on June 12th the project is unlisted and as such can not be sold, advertised or have a sales office.

As to assertions regarding Napa - the facts are that Chad Burkhardt, during due diligence for Merrill, came to Park City and spent three hours interviewing Carrie and her sales team. Carrie and her team prepared two written sale and marketing plans (including detailed budgets) which were distributed to all with follow up conference calls with Glassman and Katz. In addition Carrie and Heather went to Napa twice - once to prepare a comp market survey and on the other visit to review and price each unit after their site locations had been staked. Given all this I find it hard to believe that Merrill was unaware that of Carrie's involvement or our relationship and I find it even more interesting that you would assume that Carrie - or anyone else - would do this work for free.

### End Results & Contributiuons

I believe that I am the only person in the mix that has devoted full attention and time to this project over the past two + years. I am very aware that pride of authorship has impacts upon my ability to dispassionately review comments and criticism. I try my best to remain open to different viewpoints. However, I find it tiring to continue to answer the same questions over and over. I find it disturbing to be have aspersions made upon my character and conduct. Most of all I find it aggravating to have shouldered all the efforts to get this project done - and done in some people mind to premier level - and, while sharing the ongoing income streams and future values, to be treated as hired help. I would remind you that while your contribution of $50k for the sales center was important my contributions were the city entitlements, Easy Street Brasserie, the key land parcel that made the project work, and the relationship with Philo that allowed us to purchase a property for $10.2 million that was appraised three years ago for $18.5 million. For my contributions I got no credit within the partnership (nor did I ask for it) and I have received a total in fee payments of $285,000 over 30 months for my efforts to date. For your capital contribution you received the same fee payments.

### Going Forward

I agree that we must continue to move forward to ensure the success of the project. I continue to be confused by the hostile actions of Charlie towards me personally and his stand that the project is a failure. This is in diametric contrast to the stated views and actions of Bruce Davidson and WestLB. In my mind it is clear that something unknown to me is negatively influencing Charlie. Be that as it may the solution - in my continued opinion - is to get BN paid off. I am not skilled or knowledgeable in this field and as such must rely upon other partners with those skill sets. What ever I can do to help with those efforts I am at your disposal. In the meantime I will push to get the project complete with CO to reduce our personal risks and to concentrate on the hotel operations and the real estate sales (if that area continues to be within my perveiw).

Best regards

b

William Shoaf
Managing Director
CloudNine Resorts
136 Heber Avenue, Suite 303
PO Box 683300
Park City, Ut 84068
Telephone: (435) 649.6649
Direct Line: (435) 658.9428

4

Fax: (866) 712.0135
Email: bshoaf@cloudnineresorts.com

Bill

I am writing this note to express both my deep concern for the progress of events on Skylodge and my desire to be constructive in restoring what is apparently a damaged partnership relationship on several levels in which you have excluded me from information and decision-making while exposing me to financial risks.

First, it is very apparent that you harbor some antipathy toward me that has led you to exclude me from partnership deliberations and that you have sought out Michael Feder's involvement in a further attempt to isolate me from any role in the project and from access to financial information.   This point was driven home the weekend of March 2nd when I came to Park City in an effort to resolve the on-going dispute with BayNorth who had been seeking final completion numbers and operating reports on the project since November 2007.   It was clear that you had influenced Michael to accept your view of the world and project status.   Michael asked me to work with Chipper to get the "facts" on the completion costs and budgeting.

I endeavored to do so, but was then stymied when you directed Chipper not to work with me and to provide all financial information only to you and Michael.   I reported this to Michael and he said he would work to resolve the information flow.   I grudgingly agreed to his request, "to humor him" as he said, by allowing him a "couple of weeks" to try his hand at resolving matters constructively with Charlie.   Michael indeed talked to Charlie several days later and reported to me that he was pleasantly surprised to find Charlie "reasonable and constructive".   No doubt Michael was surprised because you had characterized Charlie in a most unfavorable way.  We are now two months later and tensions with BN have only escalated into an exchange of letters and prelude to litigation rather than what should have been a fairly simple resolution.

I believe that had I not been restrained by you and Michael, I would have continued on the course I proposed and we would have

5

WICK-00029

resolved matters with Charlie so we could all focus on the business of making Skylodge successful. Instead, we have wasted more resources in a battle in which you have labored to justify your past actions rather than simply provide the answers we all need to make informed decisions about the future of the project.

You have worked very hard on the project and it is understandable that you would bristle at criticism.  However, while you send countless emails saying how you issued many reports to BN so they were fully informed, a simple look back at those reports shows the fundamental problem has been that you made unilateral decisions and the budgets kept changing dramatically such that no one could be expected to have known the facts or made informed approvals. As an example, you have often cited that you reported on the decision to expand the F&B venues in your July 2007 report. However, you presented that unilateral decision after the fact and allocated no incremental costs to the decision while reassuringly opining that it would create value and enhance profits. (We now know the costs were over $300k and the restaurants are bleeding operating losses.)  In that same report you projected that the costs to complete Skylodge would only use about $500k of the nearly $3.5 million of total project capitalized contingencies so none of us felt any sense of alarm at a point when the project was within a few months of completion and we could reasonably expect that most big issues had been confronted already.

In the 2008 budget you sent out dated October 15th you reported that the final development budget was essentially on track at $49.492m and that operational income for 2008 would net profits just over $1m.   Just a few weeks later at the November construction draw meeting we learned that we were in fact several million dollars cost over that report and you were not yet sure of the final costs.  That is the meeting at which Charlie expressed alarm at the costs and threatened you with default for incurring cost overruns without lender consent.  Even Merritt & Harris's representative was concerned about the big increase in FFE costs and adamantly opposed approval of the requisition.

At your request I worked diligently with Charlie to allay his concerns and provide you with breathing room to complete the project by December 26th (three months behind schedule) and get your budgets together.   By January 31st you were reporting development costs at $52.69m, then $53.64m on February 24th, $55.17m by March 15th and $55.68m on April 20th.  It is no

6

WICK-00030

wonder that Charlie sent you an email saying he was reluctant to keep asking you for the completion costs since they kept escalating every time he asked you for a report.

The simple point is that it serves little purpose to engage attorneys' time in drafting letters arguing that you issued full information reports to lenders and investors and had their approvals when even a cursory review shows that the reports were not reliable indicators of the project status so no well-informed approvals could have been made. If the lenders had approved all these cost overruns there should be signed approvals and no need for debate. Where are these approvals?

Let's get over all the effort to justify ourselves and focus on solutions. We have pressing problems of how to fund completion costs that exceed capitalized sources by nearly $6m at last count and erode profitability. The operational budget for 2008 projected net income over $1m and you recently recast this result in half using optimistic assumptions that are still unlikely. Net losses are more likely unless we take drastic action soon.

The Operating Agreement mandates that only you and I are obligated to fund capital calls. I am most distressed and object to being put at risk by a partner that takes unilateral actions and only grudgingly informs me after the fact (at same time as the lenders and partners) about the costly and risky decisions he made.

You are now pressing for a decision about signing a brokerage agreement with Keller-Williams and I have just returned from Asia. I have not seen if or how any of the players have responded to your email note below of this prior week in which you urge a quick approval for the sake of the project. I must say that I have yet to see compelling evidence that KW will be able to provide greater sales support to the project than Prudential or other firms with more international and local presence. (When we started this project you touted Prudential as the clear choice to be the listing agent since they would assign their top sales people and support. Only recently when you started to lobby for KW have you revealed how poorly Pru has performed during your watch.) The main reason I have heard for switching to KW is that the brokerage fee would be reduced from 7% to 6%. Saving money is always good, but you have projected about a $300k savings to the project which is fine except more important is a sales strategy that truly addresses the current lack of sales strength. Getting a firm with stronger international and

7

WICK-00031

national coverage may be more important to us than simply doing more of the same local strategy.

Frankly, I have to make this point and do so in this forum to avoid personal embarrassment for you among the lenders and investors. The KW brokerage agreement includes Carrie's company LRG as the exclusive listing agent along with KW. This is clearly a "related party" transaction which requires far greater disclosure and higher standards than it has been given. It is a bold grab for personal aggrandizement that goes beyond Carrie legitimately earning a brokerage fee for actual sales she generates. Related party transactions are always most sensitive because they can poison partnerships and lead lenders and investors to question the integrity of the actions and motivations. Related party transactions are typically prohibited entirely or require unanimous consent of all parties after a more thorough disclosure of all the facts as is the case in our Operating Agreement. Usually a related party transaction is only done if it offers a vastly superior service than any other third-party transaction. I have yet to see adequate disclosure and compelling reasons for this KW agreement that grants exclusive listing agent status to Carrie and KW for 24 months and with no performance standards. She has every right to earn brokerage fees on sales she makes, but to get a listing agent fee and some other consideration from KW is another matter altogether.

In this context, I have to remind you of some salient factors. In the beginning of this project you aroused Charlie's concern when he learned after the fact that you and Carrie had purchased a Skylodge unit on the preferential terms offered in the first phase. His objection was that while you had stated you were unable to invest equity in the project you now had ample money to put into a purchase that assured you a handsome capital gain given the preferential purchase terms. I went to bat for you and convinced him to accept it as a way of you showing confidence in the project. However, that is frankly a weak argument and Charlie's concern was legitimate. I deliberately did not invest in a unit because I thought it unethical and undermined our position of resisting BN's call for us to invest equity in the project while you on the other hand bought preferred units. Instead, I convinced Charlie of "our" financial commitment by virtue of the $50k I invested in creating the sales center. I made that investment before anyone else invested any capital and before we had assurances of the overall

8

deal coming together.  At the time you expressed sincere appreciation to me for my doing so.

As another example in the case of Terrano, at the beginning of the project I could have nominated Meredith to serve in a General Manager or Project manager role, but I did not because I believe it imperative to avoid even the appearance of conflicts of interest or related party transactions.  Meredith has vastly superior credentials that any investor would have unquestionably accepted.  She was the head of all corporate real estate and facilities for both Oracle Corp. and Charles Schwab.   She managed millions of square feet of real estate and all the food services and facilities worldwide.  It would have been to our advantage to place her there, but I did not even raise the issue.

By contrast at Terrano, last year you proposed installing Carrie as the exclusive listing agent to collect a fee of 1.5% of all sales and projected her earning nearly $2m in that position.  There was no supportable reason to justify making her the exclusive listing agent and it even violated express terms of our jv agreement with ML.
 When I questioned it, you told me Merrill Lynch had accepted it.  I checked and they had only understood that your wife was a broker and may be able "to sell a few units" and collect a normal brokerage fee on those sales.  They would never have approved her as listing agent.

I think it most important that we avoid all appearances - let alone reality - of conflicts of interest and fair dealing with our lenders and partners.

While I am deeply concerned about the financial position of the project, I also believe the solutions are clear.  I have cited the strategies and issues we should pursue but you have ignored my emails and pursued unilateral decisions that threaten our finances. We must have open book discussions about the project and arrive at consensus solutions.

During the life of the Skylodge development I have found you to make unilateral decisions that I learn about only belatedly when there was no remedy.  Until this past November, your unilateral actions were disturbing but none of your reports indicated that we were over-budget and threatened with

9

WICK-00033

capital calls or default.   All that has changed and I cannot accept being blindly put at financial risk by your actions.

It is most apparent that you have chosen to exclude me from the information flow and decision-making while you have brought Michael Feder into your confidences. This is ironic given how bitterly you complained about Michael and Liz during the project. You bristled whenever I would report to you on Michael's comments during dinners he and I had in NYC when he questioned your sales program or other matters. You were eager to get them out of the partnership at the earliest opportunity. Of course, you have been highly critical of all the lenders and partners in this project. You clearly resented all of them for various reasons even though they had made possible this project that you have used to elevate yourself.   Apparently I too have become subject to your bitterness which now also puts me in financial jeopardy.

I can imagine your feelings of bitterness cannot make you happy on a personal level and now they threaten to disrupt our arriving calmly at good decisions for the success of the project.   I sincerely hope we can rectify this.   For my part I do not know what I have done to offend you, but apologize if I have unwittingly offended you in some way.   I had given you my confidence in many ways over the past several years despite the break-up of your last partnership.  I now simply look for the accountability and open discussion that should be the hallmarks of a good working partnership.

Regards,  David

On Apr 30, 2008, at 9:57 AM, William Shoaf wrote

Please see attached.

The two bedroom shared interest under contract will fund on Thursday. We are expecting the remaining unit under contract to close within the next two weeks.

April is very slow throughout the town not only because it is historically a low period but the weather has been very unfavorable with off and on snow days and windy periods in between. Net result is that the town occupancy is running less than 10% city wide and most of the retail outlet are either closed or operating under very constrained schedules.

We continue to work with potential clients and we have been retuning the web site to increase our click through performance.

10

WICK-00034

I have not received any feedback on the issue of moving the listing from
Prudential to Keller Williams. We need to move forward with this effort so that
we can use the present slow times to do the one on one training needed for
the KW sales team to ensure we are prepared for the summer season. Please
advise.

b


= <Sky Lodge -REPCTrack -Apr27_08.xls>

William Shoaf
Managing Director
CloudNine Resorts
136 Heber Avenue, Suite 303
PO Box 683300
Park City, Ut 84068
Telephone: (435) 649.6649
Direct Line: (435) 658.9428
Fax: (866) 712.0135
Email: bshoaf@cloudnineresorts.com

=

=

=

11

# **<u>Exhibit E</u>**

| | |
|---|---|
| **From:** | William Shoaf <bshoaf@cloudnineresorts.com> |
| **Sent:** | Monday, April 28, 2008 9:32 PM |
| **To:** | Charles Flint <CFlint@baynorthcapital.com> |
| **Cc:** | Michael Feder <michael@thefedergroup.com>; Elizabeth Rad <erad237@yahoo.com>; Philo & Diane Smith <smithphilo@hotmail.com>; David Wickline <wicklinedavid@cs.com>; Allen Taylor <allen.taylor@taycap.net> |
| **Subject:** | Easy Street Partners Resolution |

The members of Easy Street Partners have approved a resolution appointing Michael Feder to be the point person in communication and discussions with BayNorth as it pertains to the Sky Lodge project. Mr. Feder will provide the members of ESP with updates and suggested actions steps for their review, consideration or approvals as he works with BN to resolve current and future issues.

Best regards,

Bill Shoaf

CloudNine Resorts

**BN-0014775**

BN-0014775

# **<u>Exhibit F</u>**

| | |
|---|---|
| **From:** | Elizabeth Rad <erad237@yahoo.com> |
| **Sent:** | Friday, May 9, 2008 8:37 AM |
| **To:** | William Shoaf <bshoaf@cloudnineresorts.com>; David Wickline <wicklinedavid@cs.com> |
| **Cc:** | Michael Feder <michael@thefedergroup.com>; Elizabeth Rad <erad237@yahoo.com>; Blake Parrish <blake@bparrishlaw.com> |
| **Subject:** | Re: Skylodge - need for open book discussions |

Dear David,

I would like to make my position perfectly clear. I have gone thru the paperwork you provided prior to PC1's equity investment. If we had received full disclosure at that time I for my part would never have done the equity investment. At that time we were given a term sheet from Baynorth and were told that was the deal. Baynorth re-traded the deal in the 9th hour which substantially reduced our profit potential and you and Larry Vogler allowed that to happen. If it wasn't for my belief in Bill Shoaf I would have blown the deal apart at that point, due to the lack of disclosure. Except for your participation in the equity raise and the mezz loan at the beginning of this project (which was entirely mismanaged) I have not seen your contribution to the project. Actually that is not true, you were solely in charge of interaction with Baynorth until this January. You mismanaged that relationship and enabled Baynorth throughout the development phase, you and Larry created a situation where Baynorth was allowed to re-trade the deal, and instead of supporting the project, supporting your partner your dealings with Baynorth supported Baynorths belief that somehow the project was financially and materially mismanaged. I want you to know I hold you solely responsible for the increased costs in both money and time that the mismanaged Baynorth situation has caused us.

It is inconceivable to me what in the world you were thinking. Theoretically you were represented to be a 50% developer in the project, and therefore entitled to 50% of the developer fees. You did not even show up in Park City during the entire development process. Your emails show that the only role you played from the moment we closed thru December of last year was to deride and question Bill Shoaf and to support Baynorths efforts to deride and jeopardize the project for their own financial gain.

I am unbelievably thrilled with the outcome of the project due entirely to Bill Shoafs efforts, to Carrie Shoafs incredible sales results during a most difficult economic climate. The immediate responses of Bill Shoaf to any financial request, the financial reporting by Bill Shoaf during the entire process, the sales reports and marketing reports by Carrie Shoaf and her sales team, the monthly update emails by the sales team to the buyers, displays to me an extremely conscientious professional management of all aspects of this project.

Let me make myself perfectly clear.  I would suggest
that from this point on you be very careful of which
side of the table you are on.  I would also point out
that we are very fortunate that Michael Feder is
willing to help clean up the situation you
manufactured.  If I was you I would do everything I
could to assist Michael, Bill, Carrie, etc. in their
efforts.  Believe me it would be in your best
interest.

Thank you for your time.

Elizabeth Rad
--- William Shoaf <bshoaf@cloudnincresorts.com> wrote:

> David
>
> Thank you for your email and please excuse my delay
> in responding but
> I have had pressing matters with regards to
> buttoning up close out
> issues with Sky Lodge, compiling final accounting
> from the
> subcontractors, and providing Merritt & Harris with
> requested
> documentation needed for the processing of the next
> disbursement
> request.
>
> From speaking with Michael it appears that you have
> shared your
> concerns regarding my non responsiveness to you with
> him and as such I
> have included PC1 in this response to ensure we are
> all in the loop
> and copied Blake as he was included in the initial
> email.
>
> For clarity and efficiency I would like to address
> your points in the
> order presented below:
>
> Exclusion of your involvement / Withholding
> Information
>
> I have provided numerous reports and worksheets,
> answered countless
> emails and had many one on one conversations with
> all of the partners,
> bankers and consultants associated with the project.
> Whenever you have
> visited the project I have made myself available,
> rearranged my
> calendar accordingly and answered all questions
> asked. This has been
> true of my actions with all the partners, bankers
> and consultants over
> the 2+ years.
>
> I have specifically spoken with Chipper regarding
> his provision of
> information to you during the visit you cite, and
> other occasions, and
> can assure you that he has never been instructed by

> me to withhold
> anything. In fact the meeting you speak of was
> arranged within 30
> minutes of the request that weekend in question and
> my understanding
> was that Meredith and yourself spent 5 hours with
> Chipper on Sunday
> reviewing whatever documents were requested. My
> further understanding
> in speaking with Chipper is that you have contacted
> him on other
> occasions for information and he has supplied it to
> the best of his
> ability.
>
> As to assembling the "facts" on the project
> requested by Michael that
> was eventually delegated to Chipper and Brenda to
> execute and ended up
> on my desk to review and ensure timely processing.
>
> Involvement of Michael Feder & PC1
>
> First and foremost I make no apologies or
> explanations for my
> including Michael's (or any of the other partners)
> in the issues of
> the project. I would suggest that your criticism of
> that is somewhat
> in conflict with your previous view of being
> excluded from the
> information flow of the project.
>
> As to the May 2nd meeting I believe it is best to
> refresh the memory
> of the actual chain of events that surrounded this
> weekend. First and
> foremost Michael was at the property on a holiday
> with his family that
> had been booked for several weeks. His presence was
> coincidental.
> However, your visit to the property was planned
> directly with Steve
> Koersleman with no notice to me. I became aware of
> your visit second
> hand from Steve. This unusual situation was further
> complicated by
> your booking a room for Allen Taylor directly with
> Steve without
> informing me again. Given the state of the
> partnerships relations with
> BayNorth at that time I found (and still find) this
> set of
> circumstances to be very curious and disturbing. I
> shared my concern
> with Michael and his reaction, as you are aware, was
> to exercise the
> rights of PC1 and assume leadership of the
> partnership.
>
> As to my relationship with the members of PC1 and
> Smith Trust I have
> had ongoing interactions with the partners over the
> two years as they
> have visited the project and / or called to ask

> questions or inquire
> as to the progress of construction or sales.
>
> Current Status with BayNorth
>
> I agree wholeheartedly that this situation with BN
> is undesirable and
> potentially dangerous. However, I would take issue
> that this is the
> result of bad faith actions by myself or lack of
> response by myself or
> Michael. Quite simply BN - via Allen Taylor - have
> not read what was
> sent or pay attention in meetings conducted over the
> past two years. I
> find it completely illogical that Ricardo Flores of
> Merritt & Harris,
> all of the Jacobsen crew, Steve Brown, and Chipper
> Leonard could sit
> through the same meetings and receive the same
> documents as Allen
> Taylor and fully aware of what was going on while BN
> presents that
> they were kept in the dark. It simply does not hold
> water. I also find
> it disingenuous for Charlie or you to present this
> as fact when
> neither of you were present for over 80% of the
> meetings and have no
> basis to judge the actions of Taylor Capital as the
> consultant during
> those visits.
>
> The fact is - as I presented to you in the early
> fall as well as Larry
> Vogler when I asked for assistance - that Charlie is
> simply looking
> for a retrade. Just like he did at the closing
> table. No more no
> less.  I have held this to be the case from Day 1
> and I would suggest
> that Charlie's actions with the payment requests and
> brokerage
> agreement situations confirm my view that documents
> / requests are met
> initially with no review or feedback and then - when
> pressed for an
> answer - a blanket denial.
>
> Financial Reporting
>
> The reporting of the cost status of an ongoing
> construction project
> that has over 200 workers on 12 hour a day shifts,
> 103,000 square feet
> of new construction, and 8,500 square feet of
> historic renovation is
> not a precise exercise. It is assembling the best
> data at the time and
> providing a studied estimate. As your experience
> managing the
> entitlement cost for Napa showed - what started as
> an estimated cost
> of $4 million, when the dust settled, had a cost of
> $7 million. It is

> the nature of development.
>
> As to your examples of cost escalations from the
> progress report put
> together for January 31st that report was done (as I
> explained in the
> email sent with the report) late night during the
> Sundance Festival
> period. Not the best time for this type of effort
> but done nonetheless
> to appease BN. You are correct that from this report
> to the February
> report the number jumped $952K - of which $742K was
> due to improper
> period to date numbers that went back to 2006 and
> had been validated
> by an external audit. From February to March the
> number went up $92K
> (a 0.17% increase) and from March to April by $51k
> (a 0.097%
> increase). Expecting to have a final number by end
> of January that
>
=== message truncated ===

Elizabeth Rad

Cell - 516-398-4849
Fax - 212-755-9652

# **Exhibit G**

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** June 5, 2008 8:10:53 PM PDT
**To:** Charlie Flint <cflint@baynorthcapital.com>
**Subject: Fwd: CONFIDENTIAL**

Charlie
The tame part of my exchanges with our friend Feder.   He indicated below he could have your approval at his demand......perhaps he will find disappointment.

Begin forwarded message:

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** June 5, 2008 4:02:03 AM PDT
**To:** Michael A. Feder <MFeder@radarlogic.com>
**Subject: Re: CONFIDENTIAL**

Michael
My "clarification points" below simply reflect:
a) the existing provisions of the ESP Operating Agreement regarding "related party" transaction approvals,
b) concern for good governance and honoring of fiduciary obligations to lender and partners alike with respect to co-mingling of resources between Skylodge and Sorrell River Ranch.

My concerns are by definition legitimate and my consent to the proposed listing agreement is conditioned on such adherence to the terms of the Operating Agreement and fiduciary responsibilities.

I expect our discourse to have the tenor of mutual professional respect and that our views be based on fact and reasoned judgment.  Of course, we both share an interest in finding ways to make Skylodge a financial success for all parties.  Best Regards, David

On Jun 4, 2008, at 11:04 AM, Michael A. Feder wrote:

I vote yes as doe liz. Bruce and Phylo voted yes. I assume you vote yes and all I need is Charlie which I expect to get by end of day. You yes or no?

1

WICK-00010

Michael Feder
917 968 9668

-----Original Message-----
From: David Wickline <wicklinedavid@cs.com>
To: Michael A. Feder
Sent: Wed Jun 04 14:03:42 2008
Subject: Re: CONFIDENTIAL

Michael
Definite improvement.

Clarifications:
1. Bill should recuse himself from the ESP vote to terminate listing..  ESP operating agreement requires majority approval of the other partners involving a related party transaction.  Effectively you and I would have to agree on change.  I trust we can.

2. Bulk carve-out carries same recusal point.

3. Bill's prior emails alleged LRG and him personally paid all marketing costs in past.  While false, will they personally pay all future costs?  We should not bear costs of Sorrell River which are getting commingled.

4.  There are no performance standards but you and I expect to keep them on short lease.  90 day termination notice is their response rather than 1 day notice you proposed.  Your call.

David
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Michael A. Feder" <MFeder@radarlogic.com>

Date: Wed, 4 Jun 2008 12:13:21
To:"David Wickline" <wicklinedavid@cs.com>
Subject: CONFIDENTIAL


FYI, only, please.

_____

MICHAEL A. FEDER
Radar Logic Incorporated


From: William Shoaf [mailto:bshoaf@cloudnineresorts.com]
Sent: Wednesday, June 04, 2008 12:12 PM
To: Michael A. Feder
Subject: KW Listing Agreement
Importance: High

Michael


Spoke with Carrie / KW regarding the listing issues. They are agreeable


1)      A 90 written notice of cancellation from Easy Street Partners - i.e. the same procedure as we are using to get the new listing agreement approved.


2)      No commission on a bulk sale unless LRG / KW were the procurer of the bulk sale client and only if the bulk sale offer was agreed to by ESP and the lenders as per the operating and loan agreements.


b

2

WICK-00011

William Shoaf

Managing Director

CloudNine Resorts

136 Heber Avenue, Suite 303

PO Box 683300

Park City, Ut 84068

Telephone: (435) 649.6649

Direct Line: (435) 658.9428

Fax: (866) 712.0135

Email: bshoaf@cloudnineresorts.com <mailto:bshoaf@cloudnineresorts.com>

3

WICK-00012

# **Exhibit H**

l

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** June 9, 2008 7:20:00 AM PDT
**To:** "Charlie Flint" <cflint@baynorthcapital.com>
**Subject: Re: Brokerage Agreement**

These replies are so disingenuous.

David Wickline
Founder - Terrano Napa Valley Resort & Winery
400 Silverado Trail
Calistoga, CA
Mobile 415-516-9468
Office  707-874-3890

On Jun 9, 2008, at 4:44 AM, Charlie Flint wrote:

Latest

---

**From:** Michael A. Feder
**To:** Charlie Flint; blake@bparrishlaw.com
**Cc:** cbarker@goodwinprocter.com ; fmastroianni@goodwinprocter.com ; bshoaf@theresortclubs.com
**Sent:** Fri Jun 06 16:51:19 2008
**Subject:** Re: Brokerage Agreement

If I understand correctly, the economics are better. And Pru is have difficulties. As to the 30 days, I am comfortable with 90, but if we can do better, we should. As to any cancellation being a Bay North alone decision, I don't think that's appropriate. They get a vote, but not the sole decision.

1

WICK-00015

I am available if anyone wants to talk.

Charlie, thank you for responding quickly.

Michael

---

Michael Feder
917 968 9668

-----Original Message-----
From: Charlie Flint <cflint@baynorthcapital.com>
To: Blake Parrish <blake@bparrishlaw.com>
CC: Michael A. Feder; cbarker@goodwinprocter.com <cbarker@goodwinprocter.com>; fmastroianni@goodwinprocter.com
<fmastroianni@goodwinprocter.com>
Sent: Fri Jun 06 16:45:53 2008
Subject: RE: Brokerage Agreement

....other than the economics of the arrangement between Easy Street Mezzanine, LLC and the brokerage firm, what is the incentive to change from Prudential? Is it because Keller Williams will provide use of its brokerage license under better economics to Carrie and her team?


A more standard provision would allow this agreement to be cancelable in 30 days or if Easy Street Mezzanine is declared in default under any of the loan agreements.

As this is a related party transaction, BayNorth needs the ability to trigger a cancellation of this agreement which Michael has refused to accept.  Don't the documents require BayNorth's approval of any related party transactions?  Do you have any suggestions?


The preceding questions are extracted from my prior email. Based upon your comments Cloud Nine Resorts should have been listed as party to the listing agreement as opposed to Easy Street Mezzanine, LLC in the questions.  As a follow up to your response #4 where you state "we would draft into the Keller Williams Listing Agreement a provision that Carrie's group is the listing agent for the project", do you also plan to include a provision in the agreement that Cloud Nine Resorts may  cancel the agreement without notice if Carrie and her group are no longer assigned to the project.  Do you have a list of the people in Carrie's group? In reviewing the brokers of record it would appear that in addition to Carrie, Peterson, Benson, de Bruijn, Nadeau, Frost and Miller have been most active.


---

From: Blake Parrish [mailto:blake@bparrishlaw.com]
Sent: Friday, June 06, 2008 3:34 PM
To: Charlie Flint
Cc: 'Michael A. Feder'; cbarker@goodwinprocter.com; fmastroianni@goodwinprocter.com; Allen Taylor
Subject: RE: Brokerage Agreement


Charlie,


What questions did I fail to answer?  Please clarify.

2

WICK-00016

Blake Parrish

Telephone: (801) 572-9705

Fax: (801) 495-9792

Cell Phone: (801) 589-4531

Email: blake@bparrishlaw.com

---

The information contained in this communication is proprietary and confidential, may constitute inside information, may be subject to the attorney-client privilege, and is intended only for use by the addressee. Unauthorized use, disclosure, or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please delete all copies from your computer and notify blake@bparrishlaw.com. Thank you.

---

From: Charlie Flint [mailto:cflint@baynorthcapital.com]
Sent: Friday, June 06, 2008 7:37 AM
To: Blake Parrish
Cc: Michael A. Feder; cbarker@goodwinprocter.com; finastroianni@goodwinprocter.com; Allen Taylor
Subject: RE: Brokerage Agreement

Blake,

Thank you this was helpful, could you please review my email and address some of the unanswered questions? I am trying to be responsive and would like a complete picture.

Charlie

---

From: Blake Parrish [mailto:blake@bparrishlaw.com]
Sent: Friday, June 06, 2008 2:07 AM
To: Charlie Flint
Cc: 'Michael A. Feder'; cbarker@goodwinprocter.com; finastroianni@goodwinprocter.com; Allen Taylor
Subject: RE: Brokerage Agreement

Charlie,

Please find my responses to your questions as follows:

3

WICK-00017

1. Engagement of Carrie Shoaf's Team Without a National Affiliation. This approach could work from a legal perspective, if Carrie Shoaf were to jump through the requisite hoops to form her own brokerage. However, such an approach would take some time and could be fairly expensive. I do not know whether Carrie Shoaf would consider taking such an approach because I have not discussed this issue with her. Moreover, this type of action could be perceived in the close-knit community of Park City as an indication there is some type of problem with The Sky Lodge. Most associate brokers do not leave a national brokerage to form their own local brokerage - particularly in challenging real estate market such as we are experiencing.

2. Advantages of National Affiliation. Until such time as Carrie Shoaf could form her own brokerage, The Sky Lodge would not be listed on the MLS system (i.e., the electronic listing system). This would have a negative effect on marketing. Also, a national brokerage provides exposure for The Sky Lodge to a national audience. Finally, a national brokerage with multiple offices in Utah provides a greater pool of real estate agents to generate referrals than a single-office brokerage located in Park City with only a handful of agents. In short, a national brokerage simply has a much better presence on a local level, and a presence at a national level where none would exist with Carrie alone.

3. Favorable Listing Terms with Keller Williams. Based on my conversations with Bill Shoaf and my brief review of the proposed Keller Williams Listing Agreement, Keller Williams is willing to list The Sky Lodge for a 6% sales commission, which is 1% less than Prudential presently is charging. Moreover, I understand that Keller Williams will provide Easy Street with a 90-day termination clause, which can be exercised for any reason. Such a provision reduces the risk of making a change if the affiliation with Keller Williams is not satisfactory.

4. Control of Listing Agents. The current listing agreement technically is between Prudential and Cloud Nine Resorts. However, Carrie Shoaf has been the listing agent for The Sky Lodge since its inception and the listing ended up at Prudential as a result of Carrie's affiliation with Prudential. Were you inclined to move to Keller Williams, we would simply draft into the Keller Williams Listing Agreement a provision that Carrie's group is the listing agent for the project.

5. Status of Prudential vis a vis Keller Williams. It has been my experience that while the sales team marketing a project is a critical component to the marketing efforts, broker affiliation also is important. At the time that Prudential was engaged to market The Sky Lodge, Prudential's affiliation gave the project substantial credibility. It is my perception that Keller Williams is viewed as an up and coming brokerage in Park City. The reputation of Keller Williams is very good. Keller Williams is headed in Park City by an attorney (Dave Johnson) who was the former legal counsel to Prudential. Dave Johnson has an excellent reputation among real estate agents, and Keller Williams has been very successful in recruiting some of the top agents in the Park City market.

Please let me know if you have any additional questions.

Blake Parrish

Telephone: (801) 572-9705

Fax: (801) 495-9792

Cell Phone: (801) 589-4531

Email: blake@bparrishlaw.com

4

The information contained in this communication is proprietary and confidential, may constitute inside information, may be subject to the attorney-client privilege, and is intended only for use by the addressee. Unauthorized use, disclosure, or copying is strictly prohibited and may be unlawful. If you have received this communication in error, please delete all copies from your computer and notify blake@bparrishlaw.com. Thank you.

---

From: Charlie Flint [mailto:cflint@baynorthcapital.com]
Sent: Thursday, June 05, 2008 5:19 PM
To: Blake Parrish
Cc: Michael A. Feder; cbarker@goodwinprocter.com; fmastroianni@goodwinprocter.com; Allen Taylor
Subject: Brokerage Agreement

Blake,

I was speaking with Michael Feder about Easy Street Mezzanine, LLC's request to change the brokerage agreement from Prudential to Keller Williams. I raised a couple of questions which he suggested that I direct to you. I would appreciate your prompt response as this is a time sensitive issue.

Michael stated (and I agree) that the team of people who are working the assignment is measurably more important than the brokerage company with which they are affiliated. If that is accepted, is there a legal reason that we need an affiliation with a national brokerage firm as opposed to contracting directly with Carrie Shoaf? If the reason the arrangement is required is because Carrie is a licensed agent but not a licensed broker, other than the economics of the arrangement between Easy Street Mezzanine, LLC and the brokerage firm, what is the incentive to change from Prudential? Is it because Keller Williams will provide use of its brokerage license under better economics to Carrie and her team?

It is my understanding (but I have not gone back to the documents to confirm) that our existing brokerage agreement is between Prudential and Easy Street Mezzanine, LLC. Michael seemed to imply that we have an agreement with Carrie and her Luxury Residential Group but I am unfamiliar with the particulars of this agreement. I was under the impression that Carrie's team, operating as LRG, were the agents assigned by Prudential to the sale of SkyLodge fractions. If we transfer to Keller Williams how do we control what team is assigned to our project? Bill Shoaf has recommended a two year agreement without any performance standards which Michael has suggested may be cancelable with a 90 day notice provision. A more standard provision would allow this agreement to be cancelable in 30 days or if Easy Street Mezzanine is declared in default under any of the loan agreements. As this is a related party transaction, BayNorth needs the ability to trigger a cancellation of this agreement which Michael has refused to accept. Don't the documents require BayNorth's approval of any related party transactions? Do you have any suggestions?

We have raised the issue of excluding any bulk sales (defined as 5 fractional units or more) that are not sourced by Keller Williams (LRG or whatever name the marketing group operates under) from commission payments under the proposed agreement. It is my understanding that Michael has accepted this provision.

Charlie

5

# **Exhibit I**

**From:** "Charlie Flint" <cflint@baynorthcapital.com>
**Date:** June 10, 2008 7:49:37 AM PDT
**To:** <wicklinedavid@cs.com>
**Subject: RE: Sky Lodge Brokerage**

I am working on a letter stipulating the terms of accepting transition, call me when you have a chance.
Charlie


-----Original Message-----
From: David Wickline [mailto:wicklinedavid@cs.com]
Sent: Tuesday, June 10, 2008 2:32 AM
To: Charlie Flint
Subject: Re: Sky Lodge Brokerage

Yes and they won't answer the direct questions you posed.  Instead Blake ignores the most salient issues and
MF blusters with simple minded responses that shows he has little grasp of the issues.
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: "Charlie Flint" <cflint@baynorthcapital.com>

Date: Mon, 9 Jun 2008 18:24:26
To:<wicklinedavid@cs.com>
Subject: Fw: Sky Lodge Brokerage


Love is in the air


---------------
From: Michael A. Feder
To: Charlie Flint

1

WICK-00022

Sent: Mon Jun 09 17:54:51 2008
Subject: Re: Sky Lodge Brokerage

Charlie

At this point it seems you are looking for reasons to hold out. I have been and will continue to be straight with you. The issue here is much simpler than its being made. You, too, are a smart guy. Is it your intention to simply cause another hiccup? Brokerage helps. Keller Williams can be short term and save us money. Pru in Park City has issues. Seems to me that it is in all our best interests to proceed with the switch and monitor sales progress. Doesn't that make the most sense?

Michael

_____

Michael Feder
917 968 9668

-----Original Message-----
From: Charlie Flint <cflint@baynorthcapital.com>
To: Michael A. Feder
Sent: Mon Jun 09 17:41:55 2008
Subject: Re: Sky Lodge Brokerage

My quess is you are a smart guy, put yourself in our shoes, do you think the developers have earned our trust? Does Keller Williams command the reputation that Pru does in the market? Are there any conflicts here? We own 6,000 hotel rooms and this is the only one where we can't get accurate operating statements on timely basis? I could go on but frankly don't have the time.

_____

From: Michael A. Feder
To: Charlie Flint
Sent: Mon Jun 09 16:57:21 2008
Subject: Re: Sky Lodge Brokerage


What exactly are you hung up on?

_____

Michael Feder
917 968 9668

-----Original Message-----
From: Charlie Flint <cflint@baynorthcapital.com>
To: Michael A. Feder
Sent: Mon Jun 09 16:55:37 2008
Subject: RE: Sky Lodge Brokerage

We are working on it but still awaiting Blake's response to the questions he failed to answer.

Charlie

2

WICK-00023

From: Michael Feder [mailto:mfeder@radarlogic.com <mailto:mfeder@radarlogic.com> ]
Sent: Monday, June 09, 2008 3:32 PM
To: Charlie Flint
Subject: Sky Lodge Brokerage
Importance: High


Charlie

It's Monday.  On Wednesday we lose the brokerage with Prudential.  We have proposed a deal with Keller Williams and everyone has agreed except Bay North.  The deal will provide us several things that we need.  It will cost us less than Pru.  It will be cancellable.  If we do not make this shift we either have to renew with Pru, which will cost us more, or go without brokerage, which we all believe will hurt the sales effort.

What would you like us to do?

Michael

3

WICK-00024

# Exhibit J

I

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** June 10, 2008 6:56:28 PM PDT
**To:** Charlie Flint <cflint@baynorthcapital.com>
**Subject: Fwd: Skylodge Objectives Memo**


Charlie
In my meeting with Feder last Tuesday I offered him some points we needed to pursue and he asked if I could put in a memo.   Here is
what I sent him this morning in attached memo.

No response from him, of course, as he went radio silent on me last Wednesday when I insisted Shoaf should recuse himself from
voting on brokerage termination since it is a "related party" transaction .  I said ESP Operating Agreement says this is how it should be
handled and hence my point was legitimate and a re-statement of the docs......of course he does not like to read or abide agreements.


Begin forwarded message:


**From:** David Wickline <wicklinedavid@cs.com>
**Date:** June 10, 2008 9:58:32 AM PDT
**To:** "Michael A. Feder" <MFeder@radarlogic.com>
**Subject: Skylodge Objectives Memo**

Michael
Attached are some thoughts on strategies to pursue.

David

1

To:     Michael Feder
From:   David Wickline
Date:    June 10, 2008
Re:     Improve Financial Performance of Skylodge Investment

Objective:  Improve Profitability and Reduce Operating Risk by:
1. Refinance to lower capital costs of carry and stabilize operating structure
2. Optimize sales program and accelerate sales velocity
3. Stabilize management operations and profitability.

Outlined below are steps we can take to meet the objectives.

**Refinance to lower carry costs and stabilize operating structure:**
The high financial carry costs of the current loan balances must be refinanced at current low
senior debt rates.  WestLB is unwilling to provide the refinancing.  Another lender must be
sought in this challenging market.  Steps must be taken to improve a lender's analysis of the
project's payback potential and these steps are consistent with operational objectives which
include:

a) cut operating losses by leasing F&B outlets to experienced and credit-worthy tenants that will
    enhance perceptions of Skylodge.  Zoom is the model.  Capitalized value of residual restaurant
    values will be enhanced.
b) accelerate sales using alternatives to the current methods.
c) amend HOA, if possible, to improve coverage of costs

The project's original projections were that senior and mezz debt would be fully repaid at
opening from a full sell out.  Current loan balances total about $25 million.  Development costs
exceeded capitalized budget by approximately $5-$6 million according to last reports in May.

BayNorth's mezz loan carries a 16% accruing preferred yield that was expected to have been
fully paid by opening and must now be replaced by lower cost senior debt equal to 60% of
appraised value.  The Cushman Wakefield valuation supports a refinancing barely equal to
current loan balances.

A negotiated early prepayment of BayNorth is unlikely to be supported by the values and
available refinancing terms.

Following financial analysis is needed to lay groundwork for approach to lenders:

a) P&L monthly reports showing departmental allocations against budget.  Such reports never
    issued yet.
b) Realistic sales velocity projections using pace of last 18 months and as evidenced by sales
    post-opening
c) Stress test sales prices against smaller phased price increases and comparing breakeven of bulk
    sale prices compared to "all in" costs of marketing and carrying unsold fractions

WICK-00039

d) Analysis of rental income received from owner rentals and relative profit/loss to hotel from this arrangement

e) Analysis of profitability of hotel "owned 85 days " given the low season availability of this inventory

f) Analysis of HOA charges relative to covering direct cost of owner services and usage

g) Analysis of marketing costs and carry costs of developer owned units during projected sell out period

Update the Cushman Wakefield appraisal addressed to current lenders so it can be transferred to prospective lenders.

To enhance appraised values we must explore leasing the commercial condo space. An alternative to refinancing is to explore selling some or all of the commercial condo spaces to pay down debt. Need to explore relative values of selling with good leases or unencumbered. Zoom condo should be highly marketable "as is". Fin and Easy Street spaces can be simultaneously explored as leases or selling unencumbered to an end user. Capitalize on the low cap rates of commercial purchase prices as alternative to financing rates.

**Sales Strategies:**
<u>Brokerage:</u>  Secure a listing agreement that allows termination upon 30 - 60 days notice in lieu of negotiating cumbersome performance standards. See what meaningful support will be provided in terms of client access, preferential media rates, broker support. Must be a carve out for bulk buyers procured by ESP.

<u>Alternative Sales Strategies:</u>   The current sales pace could mean another 3 - 4 years to sell the remaining fractions. The carry cost erodes profitability. We cannot continue limiting ourselves to the same strategies of the past three years. You and I identified the potential to pursue alternatives such as:

a) foreign buyers from stronger currencies. We need to find brokers with access to such clients or are the type who bundle such transactions.

b) destination club buyers. While they typically buy complete units rather than portions of remaining units, there may be a way to work out an arrangement based on my preliminary conversations. They typically buy at a 20+% discount to appraised retail prices, but given marketing costs at over 13% before carry costs, it makes economic sense to sell to these clubs and accelerate sell out.

c) company buyers. Even the leading purchaser of the penthouse fractions was such an entrepreneur and we need to access similar classes of buyers.  We can pursue strategic marketing alliances with American Express, wealth management firms, and the like who may have common cause with us.

**Stabilize Operations Management:**
Skylodge is a small property carrying a large operational budget (and large risk) primarily due to excessive Food & Beverage outlets (Fin, Easy Street Brasserie, Tack Shed). The HOA is not responsible for these operational costs.  These commercial condo spaces should be leased to

WICK-00040

credit worthy tenants who can enhance image of Skylodge.   Current operations are losing money.

Must explore options of amending HOA with respect to developer owned fractions to avoid flawed provisions on balance of inventory that can adversely affect operational costs and profitability.

Typical monthly P&L reports have not been made available and may not exist.  Monthly budgets and variances not available.  Have seen no proper segregation of resources between HOA, fractional marketing, F&B operations, hotel operations.   General Manager role is de-stablized.

Key financial information is not available concerning status of escrowed fractional sale proceeds, development cost completion payments, approval for use of proceeds to pay requisitions, approval for use of sale proceeds for marketing budget.

<u>**Summary:**</u>
Actions can be taken to reduce risks of operations by leasing the commercial condo spaces in ways that enhance project value for a refinancing or sale.   Such actions will serve to both reduce financial carry costs of the project and mitigate operating risks.

Sales velocity can be enhanced by pursuing additional sales strategies.

Operational management requires better financial reporting so issues can be recognized and addressed.  Current financial information offers no guidance in making informed choices by the partnership.

WICK-00041

# <u>Exhibit K</u>

;

From: David Wickline <wicklinedavid@cs.com>
Date: July 31, 2008 7:56:53 PM PDT
To: Charlie Flint <cflint@baynorthcapital.com>
Cc: <allen.taylor@taycap.net>
Subject: Re: 2nd Quarter Operations

Hello
This is exactly the fear we all had, namely that he would do to the operations what he did to the development
costs.....make unilateral decisions that cost alot of money and inform us later, maybe, with incomplete and
likely misleading information.

I cannot trust the bottom line numbers and he does not provide the kind of departmental allocations to make
informed analysis of just where the issues lie.  However, it is clear that the restaurant operations are big losers.
As you know, I have long said we need to stop those operations and focus on finding a good restaurant tenant.
When I argued that point to Feder in June he refused to acknowledge it and casually said the HOA could pay
the operating deficits, if any.  I pointed out that the HOA does not provide for owners to cover operating costs,
but again he would not listen.

I believe Shoaf must be ousted for breaches of fiduciary responsibility to everyone concerned.  So far my
efforts have been thwarted by Shoaf taking cover from the unstinting support of Rad, Feder and passive support
of Smith.   Perhaps these results will show Rad that her golden boy, ain't.  In the past she threatened me to back
off of any involvement or concerns stating she was "unbelievably thrilled" with the project and all thanks to the
dynamic duo of Bill and Carrie Shoaf.  Feder has intervened on Shoaf's behalf, also.

I have launched legal action in the form of the call to meeting notices for both the project ownership group and
of the management entity that is 50/50 Shoaf and me.   Those meetings I called for August 13 and 14.
However, Shoaf has never responded (true to form) and Feder declined to meet at those dates.  Today we hit
Blake Parrish with a letter that should make any lawyer feel the need to call his insurance carrier.  He promptly
emailed suggesting we talk.

We should talk as I will need your support in dealing with all this.  I sent you a memo from June 10th with
some of my suggestions for improving conditions at Skylodge.  Feder has ignored it.

1

WICK-00074

By the way, today I learned of other problems for WestLB. There is a hotel project in Mendocino that is near bankruptcy. WestLB loaned on it thinking it had entitlements for a fractional development. Today they learned it never had such entitlements and the existing value may be $10m less than their loan balance! Guess we all have problems, eh?

David

On Jul 31, 2008, at 7:23 PM, Charlie Flint wrote:

Is it possible to lose this much money in three months from a 22 room resort? By my math that equates to a loss of $277 per room per night. The restaurants must be hemorrhaging money. Maybe the practice we observed of putting out the huge raw bar for no customers is still his in vogue. Who is subsidizing this operation?
CJF

---

**From:** Allen Taylor
**To:** Charlie Flint
**Sent:** Thu Jul 31 15:33:08 2008
**Subject:** FW: 2nd Quarter Operations

Looks like Bill lost $549,000 for the three months. He didn't provide a ytd or comparison to budget.
--
N. Allen Taylor
Taylor Capital Management, Inc.
6641 N. Paseo Tamayo
Tucson, AZ  85750

T. (520) 577-2490
F. (520) 577-2501
C. (520) 834-2345
Email. Allen.taylor@taycap.net


------ Forwarded Message
**From:** William Shoaf <bshoaf@cloudnineresorts.com>
**Date:** Thu, 31 Jul 2008 13:19:26 -0600
**To:** David Wickline <wicklinedavid@cs.com>, Carrie Shoaf <cshoaf@xmission.com>, Charles Flint <CFlint@baynorthcapital.com>, Bruce Davidson <bruce_davidson@westlb.com>, Elizabeth Rad <erad237@yahoo.com>, Philo & Diane Smith <spectrae@earthlink.net>, Michael Feder <michael@thefedergroup.com>, Allen Taylor <allen.taylor@taycap.net>
**Subject:** 2nd Quarter Operations



Please see attached

b



William Shoaf
Managing Director
CloudNine Resorts

2

WICK-00075

136 Heber Avenue, Suite 303
PO Box 683300
Park City, Ut 84068
Telephone: (435) 649.6649
Direct Line: (435) 658.9428
Fax: (866) 712.0135
Email: bshoaf@cloudnineresorts.com


------ End of Forwarded Message
<SkyLodge_OperationsReport2Qtr_08.doc><SL_2nd Qtr 2008.xls>

3

WICK-00076

# **Exhibit L**

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** July 31, 2008 3:34:59 PM PDT
**To:** Larry Vogler <lvogler@primegroupinc.com>
**Subject: Skylodge Fwd: 2nd Quarter Operations**

Larry
Just returned yesterday from quick trip to Micronesia.  Got your vm and happy to hear you got what you wanted on house sales.  Been working on ways to oust Shoaf and been talking to Charlie.  He and I have been concerned that Shoaf will be losing money on operations and informing us after the damage is done....attached 2nd Quarter report confirms that fear.  Over $500k loss for the quarter and with little information available to really dig into.

Feder/Rad have been sheltering Shoaf and telling me that I was the one to blame for all due to the faulty financing.  I sent memo to Feder on June 10 laying out actions to take on improving the asset and he ignores it all.

Now I think will intervene with aid of Charlie.  I already sent notice to members of partnership for an August 14 meeting which Feder says he cannot attend.  I called for an August 13 meeting of the entity of Shoaf/Wickline and heard nothing from Shoaf.  This 2nd Quarter report that he sent today should confirm to all that he must be ousted and that my warnings and suggestions for improvement be heeded.

Please call my office line when you can.  Still looking for financing for Napa.   Cheers, David

David Wickline
Founder - Terrano Napa Valley Resort & Winery
400 Silverado Trail
Calistoga, CA
Mobile 415-516-9468
Office  707-874-3890

1

WICK-00067

Begin forwarded message:

**From:** William Shoaf <bshoaf@cloudnineresorts.com>
**Date:** July 31, 2008 12:19:26 PM PDT
**To:** David Wickline <wicklinedavid@cs.com>, Carrie Shoaf <cshoaf@xmission.com>, Charles Flint
<CFlint@baynorthcapital.com>, Bruce Davidson <bruce_davidson@westlb.com>, Elizabeth Rad
<erad237@yahoo.com>, Philo & Diane Smith <spectrae@earthlink.net>, Michael Feder
<michael@thefedergroup.com>, Allen Taylor <allen.taylor@taycap.net>
**Subject: 2nd Quarter Operations**

2

# **Exhibit M**

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** September 6, 2008 10:26:13 AM PDT
**To:** "William N. Hebert" <whebert@calvoclark.com>, Kathy Fisher <kfisher@calvoclark.com>, E Calvo <ecalvo@calvoclark.com>
**Subject:** Fwd: Boston - DC visit

Sending this given Charlie's references to me and Skylodge below.   I asked him for introduction to Miraval company regarding my Napa development.

Begin forwarded message:

**From:** "Charlie Flint" <cflint@baynorthcapital.com>
**Date:** September 5, 2008 12:35:22 PM PDT
**To:** "Clancy Casey" <ccasey@baynorthcapital.com>
**Cc:** "David Wickline" <wicklinedavid@cs.com>
**Subject:** FW: Boston - DC visit

Clancy,
As you know David is the partner who is trying to get SkyLodge on a positive trajectory. Could you please set him up with either the people at Miraval or someone who can make a proper introduction per the attached email.
Thank you,
CJF

**From:** David Wickline [mailto:wicklinedavid@cs.com]
**Sent:** Friday, September 05, 2008 12:29 PM
**To:** Charlie Flint
**Subject:** Fwd: Boston - DC visit

Charlie
Checking to see if you will be available to meet in Boston or DC per below.  Please call my office line when you have a moment.
 Cheers, David

Begin forwarded message:

1

WICK-00081

**From:** David Wickline <wicklinedavid@cs.com>
**Date:** September 3, 2008 4:15:42 PM PDT
**To:** Charlie Flint <cflint@baynorthcapital.com>
**Subject: Boston - DC visit**

Charlie

1. I will be in DC on Thursday September 18th for Board meetings.   I could fly into Boston on Tuesday eve September 16th and meet on Wednesday.   Alternatively, you might be in DC and we could meet there on Wednesday or Friday.

2. Is it possible to make a useful introduction to Miraval or George Ruff if he is still connected with them? Miraval's program could be a fit with what I am doing at the Napa Valley development.

Cheers, David

David Wickline
Founder - Terrano Napa Valley Resort & Winery
400 Silverado Trail
Calistoga, CA
Mobile 415-516-9468
Office   707-874-3890

=

2

WICK-00082

# Exhibit N

**EXHIBIT N IS REDACTED PURSUANT TO THE TERMS OF THE
CONFIDENTIALITY AGREEMENT BETWEEN THE DEBTORS AND BAYNORTH**